**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                                                   Case No.: 3:08-cr-00370-J-32HTS

THOMAS G. MANUEL

_____

**DEFENDANT'S SENTENCING MEMORANDUM**

**I.     Introduction**

  The Court should impose a sentence that substantially departs and/or varies below the range established by the advisory Sentencing Guidelines to a sentence requiring no incarceration. This case presents facts and circumstances of kind, or to a degree, not adequately considered in the Sentencing Commission's formulation of the guidelines, and the circumstances of the offense and nature and characteristics of the accused warrant a sentence below the guidelines range pursuant to 18 U.S.C. §3553(a). The grounds for departure and variance are those set forth in this memorandum, as well as those set forth in Mr. Manuel's motion for downward departure. The grounds raised in support of a departure sentence are also applicable to support a §3553(a) statutory variance below the guidelines, and the grounds set forth in Mr. Manuel's Motion for Downward Departure are hereby incorporated by reference herein as grounds supporting a downward variance. Accordingly, the Court should impose a sentence of probation, home confinement, or a combination thereof.

**II.        Sentencing Under the Advisory Guidelines and Plea Agreement**

Sentencing under the advisory guidelines following *United States v. Booker,* 543 U.S. 220 (2005), requires two steps. First, a court should calculate the applicable sentencing range under the United States Sentencing Guidelines. *United States v. McVay,* 447 F.3d 1348, 1353 (11th Cir. 2006). Second, the Court should impose a sentence that is reasonable in light of all of the factors set forth in 18 U.S.C. §3553(a). *United States v. Talley,* 431 F.3d 784, 788 (11th Cir. 2005). A reasonable sentence is one that is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are retribution, deterrence, incapacitation and rehabilitation. *See* 18 U.S.C. §3553(a).

Pursuant to a plea agreement, Mr. Manuel pled guilty to one count of a violation of 18 U.S.C. §666. In the plea agreement, the parties stipulated that the total offense level is 24. Pursuant to both the plea agreement and the Presentence Investigation Report, the Court then should reduce the level to 22 because of Mr. Manuel's affirmative acceptance of responsibility. Additionally, as further noted in the plea agreement and the presentence investigation report, the offense level should be reduced by an additional one level pursuant to a Government motion under U.S.S.G. §3E1.1(b). As a result, the adjusted offense level should be found to be 21. Mr. Manuel has absolutely no criminal history, and so he falls within criminal history category I. At total offense level 21 and criminal history category 1, his advisory sentencing range is 37 to 46 months. No disputes remain pending relating to the calculation of the sentencing guidelines level, but his sentence should not require incarceration.

**III.     Sentencing Factors Under 18 U.S.C. §3553(a)**

After determining the advisory guidelines range, the Court then considers the applicable statutory sentencing considerations: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide for just punishment; (3) the need for deterrence; (4) the kinds of sentences available; and (5) the need to avoid unwarranted sentencing disparities. *See* 18 U.S.C. §3553(a); *Talley,* 431 F.3d at 786. Facts supporting the reasonableness of a non-incarcerative sentence in this case follow.

Thomas G. Manuel, who is 64-years old and a heart transplant survivor receiving Social Security Disability Income, was born and raised on Long Island, New York. Both of his parents, his brother, and a former wife, who was the mother of three of his children, all died of heart failure or heart attack. As documented in the presentence investigation report, Mr. Manuel is in poor health, as is his wife, and they have an 11-year old daughter. Since the offense conduct in this case, he has been diagnosed with bipolar disorder, which at times has produced lengthy periods of mania, manifested by poor judgment, flighty thoughts and risky conduct. *See* Defendant's Motion for Downward Departure, Exhibits "A" and "C." These and other of Mr. Manuel's circumstances, and those relating to this case in particular, are set forth below.

After attending a high school boarding school, Mr. Manuel graduated from Wesleyan University in 1968 with a Bachelor of Arts Degree. He later majored in Corporate Finance at Columbia University's Graduate School of Business, where he attended for two semesters prior to receiving a draft notice for induction into the United States Army. He thereafter enlisted in the Navy and was placed in Aviation Officer Candidate School (AOCS). After the 16-week AOCS course,

Mr. Manuel graduated first in academics, second in physical fitness and first in military bearing. During the last week of AOCS, the candidates ran the school. He was the Regimental Commander and ran the base for one week. He received the Outstanding Student Award in his Officer Candidate School class. At the completion of AOCS, he was promoted to the rank of Ensign. After completing initial flight training at Saufley Field, he was selected for jet airplane training (the other opportunities were helicopter or propeller training). Mr. Manuel was then transferred to Meridian, Mississippi for basic jet training. After completing basic jet training, he was then transferred back to Pensacola for initial carrier qualification. After completing carrier qualification (and making his first "traps" and catapult shots off a carrier), he was transferred to Kingsville, Texas for advanced jet training.

He completed advanced jet training and was awarded "Wings of Gold" in October, 1970. Due to his performance in all stages of his training, Mr. Manuel was selected as a Distinguished Naval Graduate. Mr. Manuel was transferred to Virginia Beach, Virginia into the F-4 Phantom Jet Readiness Air Group (VF 101), where he served for the rest of his active duty naval career. In 1972, the Vietnam conflict was winding down and the Navy did not require as many pilots as it did during the height of the conflict. During the conflict, he was always stationed on the east coast and did not see active duty in Vietnam. Mr. Manuel was released from active duty in August 1972. At the time of his release he had been promoted twice and was a full Lieutenant. He continued to serve in the U.S. Naval Reserves at Freeport, New York. He was honorably discharged from the US Navy in October, 1977. *See* Exhibits 1, 2, 3 and 4, attached hereto.

Once Mr. Manuel knew he was going to be released from active duty, he began to look for a job. After interviewing for several jobs, he was offered a job at Chemical Bank. In late 1972, after being released from active duty from the U.S. Navy, his family moved back to Garden City, New

York.  He and his wife had hoped to return there as they had both been born there and their parents still lived there.

Mr. Manuel commenced working in November 1972 at Chemical Bank (now JP Morgan Chase) in New York City in its Management Training Program.  He was fortunate to graduate first in the nine month training program. At the completion of the course in 1973, he was promoted to Officer's Assistant and was assigned to the Credit Department for large corporate customers located in New York City doing credit analysis for potential loans.

Mr. Manuel was promoted to Assistant Manager in early 1974.  His duties changed and he became a Junior Account Officer for large New York based corporate clients. He innovated the way the Bank marketed itself and began an aggressive calling campaign by visiting both existing and new customers in their offices.  He generated significantly increased business and his reputation internally grew accordingly.  Also, the external markets were rapidly changing with respect to interest rates, uncertainty and the fuel embargo, resulting in many problem loans for the Bank.  Mr. Manuel was able to structure a solution to a problem and convinced 23 other participating banks in the loan to accept his proposal (the loan was a syndicated loan where many Banks provided portions of the total loan).  This resulted in  more visibility for him with senior management of the bank (Senior Vice Presidents and above) and he gained a reputation as an innovative problem solver.  Six months after being promoted to Assistant Manager, he was promoted to Assistant Secretary.  He continued to work on major New York based corporate accounts; however, when a Senior Account Officer (normally a Vice President) had retired, he was named to be the Senior Account Officer on his accounts and was promoted to Assistant Vice President in early 1976.  He was also named a member of the Bank's Credit Committee.  He was the only Assistant Vice President on the Credit Committee.

Shortly thereafter, Mr. Manuel was transferred to cover the large Corporate clients based in the Mid-West. He was still based in New York but had to travel a great deal. He continued to employ his same techniques and in an 18 month time frame had the largest increase in both deposits and loans for his region in the history of the Corporate Bank. He was promoted to Vice President in 1978.

Mr. Manuel was then offered the opportunity to move to Personnel and be in charge of Recruitment and Training (two of the five human resource spokes: the others being compensation, performance evaluation and mobility). He resisted at first as he was by their own admission the best calling officer in the Bank. The Chairman then explained to him the importance of personnel to the Bank ("I am asking you to sell the Bank to the next generation of bankers. Anybody can sell a loan, can you sell the bank?").

Soon thereafter, the head of Personnel took early retirement and while the Bank searched for a new head, Mr. Manuel assumed the day-to-day Personnel Department responsibilities. He renamed the department Human Resources. He believed he made many significant positive changes in the way Human Resources operated and was perceived throughout the Bank. Mr. Manuel created a training program for managers called Managing Resources that focused on both the capital and intellectual side of the business. It was successful and remained in place long after he left the Bank.

Due to the success of Managing Resources and his communication skills, the bank's Senior Executive Vice President, who was the head of the Bank's worldwide banking, asked Mr. Manuel to help reorganize the Bank. Mr. Manuel spent nine months working directly for him and they reorganized the way the Bank managed its lending functions worldwide. As part of the reorganization and to reward Mr. Manuel for his insights and hard work he named Mr. Manuel as

head of the Financial Institution Group ("FIG"). FIG was responsible for all the Bank's brokerage relationships, insurance relationships, correspondent banking activities and government (country, state and local) relationships worldwide. He was a good manager and created a unique culture in the Bank. His Group was where the top performers wanted to be. During extremely difficult economic times (20% + interest rates), the group was able to make record profits and accounted for over half the net income of the total Bank.

Bank stocks were at a then all time low and the major measurement of performance by Wall Street for a Bank stock was Return on Assets ("ROA"). Mr. Manuel realized if the Bank originated deals, sold off pieces of the deals to third parties (investors), and kept a portion of the revenue stream as management fees, the ROA would improve dramatically, as would profitability. The FIG did over one billion dollars of loan syndications in the first year. Also, Mr. Manuel put together for the Bank as lead syndicator the first one billion dollar leveraged buy-out ever done by a Bank.

Mr. Manuel was promoted to Senior Vice President in 1981, less than nine years after starting the Management Training program. To this day, it is the fastest promotional record in the history of the Bank. In 1981, Mr. Manuel was named a spokesperson for the American Bankers Association. He was also elected as a member of the Board of Directors of the Sperry & Hutchinson Company (the "green stamp" company). *See* Exhibits 5, 6 and 7, attached hereto.

Mr. Manuel resigned from the Bank in May, 1983 and started a financial consulting business. After salvaging a few problem loans for European clients, a client asked Mr. Manuel to go to Saint Maarten to become involved in a resort, although at the time he knew nothing about the travel industry. The client had loaned a sizeable amount of money to the resort owner, Cupecoy Beach Club, for expansion, but the money was "diverted" and the expansion was never finished. Through

considerable effort, Mr. Manuel was able to put together a "workout" plan where the lender took ownership of the property, and in doing so, Mr. Manuel took over the day-to-day operation of the Resort and ultimately completed essentially a leveraged buy-out in which he became the owner/operator of the resort from 1985 to 1988.

When Mr. Manuel took over operation of the Resort, its revenues were less than $700,000. Staff was very unhappy and the Resort was close to closing its doors. In less than 18 months he increased the annual revenues of the Resort to over $6,000,000.00. He accomplished this growth by making a deal with a New Jersey wholesaler of air travel and hotel packages, Liberty Travel. The Caribbean travel season is very short (industry word is seasonal) and the attitude of all resort operators was they had to make their money while the getting was good. Mr. Manuel understood the wholesaler deals with the airlines were annual. Therefore, he went to Liberty Travel with an annual deal and gave them prices that were annual prices knowing that Liberty would make a killing in the season (obviously at his expense); however, he knew during the off-season when he needed occupancy he would get all of Liberty's Saint Maarten business as Liberty had in essence become the "owner" of each resort room. Mr. Manuel was able to transfer his room ownership risk to Liberty from him. Naturally he made similar deals with the other wholesalers. Before his fiscal year started he was "guaranteed" at least a 50% occupancy. Within the first year his average occupancy went from less than 20% to 78% on a year-round basis.

During this same time period, Mr. Manuel founded Caribbean Reservations Systems ("CRS" - based in Norwalk, Connecticut) for the purpose of booking rooms and marketing for the Saint Maarten resort. Over time he added other resorts (mostly smaller resorts – less than 100 rooms). CRS did room bookings and some marketing for other resorts.

In 1986, Mr. Manuel was approached by a New York investment banker, who persuaded him to add a casino to the resort's operations in 1987. He gave up control. After the new investors changed the mission of the resort, its success diminished.

As Mr. Manuel's role at Cupecoy in Saint Maarten was significantly diminished due to his minority stake, a group of investors approached him and asked him to join their ownership team to build a resort on Providenciales, Turks & Caicos Islands. He built a 226-room resort called the Turquoise Reef Hotel & Casino. From 1988-1991, Mr. Manuel was the Executive Director and part owner. As his wife was tiring of living in the Caribbean, he sold his hotel interests in 1991.

Mr. Manuel was an avid scuba diver. In 1991, his partners and he acquired a travel agency that specialized in the packaging of scuba diving trips (air, accommodations and dive excursions). In 1993, Mr. Manuel and his partners sold the travel agency. Shortly thereafter, he was asked to become President of Aero Ambulance International, a provider of medically-based air evacuation services. Aero was having serious financial problems, but Mr. Manuel was able to return the company to profitability. The company was sold in 1995.

In 1995, Mr. Manuel was named Executive Vice President of a start-up membership service company (the clubs sold by credit card issuers) called Insight Technologies. Unfortunately, the company was unable to reach the needed economy of scale and the business was closed in 1997. Mr. Manuel, however, liked the membership service club concept. He immediately approached a telemarketing company, which agreed to partner with him. He became President of Data Decision, Inc., a membership service company. Within 12 months, Data Decision had two important clients: The Bank of America Travel Club and the JC Penney Pet Club.

In March 1998, Mr. Manuel suffered a major heart attack which effectively ended his business career. After his heart attack, Mr. Manuel was unconscious for 15 days and in cardiac intensive care for almost three weeks. A pacemaker/ defibrillator was implanted in his chest. After his release from the hospital, Mr. Manuel's cardiac condition continued to decline. Due to the loss of income, he was forced to move his family to a more affordable home. In early 2001, his wife, Terry, was downsized from her job and the family lost her income. At that time his cardiac care was provided by the University of Miami/ Jackson Memorial Hospital. Due to his ongoing severe cardiac problems, his physicians began to evaluate whether Mr. Manuel was eligible for a heart transplant. This evaluation lasted approximately one year, at which time he was placed on the heart transplant waiting list. Fearing for the long term well being of his wife and young daughter (then four years old), the family decided to move from South Florida. After visiting possible areas to relocate, the family decided to move to St Johns County in October 2001, purchasing a home in Julington Creek Plantation.

After moving to St. Johns County and while waiting for a new heart, Mr. Manuel began voraciously reading newspapers, developing an interest in the issues facing Julington Creek Plantation (a 6000+ residential home planned community). A new proposed planned community (Aberdeen/ Durbin Creek) would have adversely affected Julington Creek. This proposed new development started Mr. Manuel's community activism. He teamed up with another Julington Creek resident, Cindy Stevenson, to convince the developers to alter their plans. They agreed and the potential adverse impact to Julington Creek was eliminated.

During 2002, the Julington Creek Community Development District Board (CDD) was studying different ways to expand the community's recreational facilities as the number of residents

was soon going to make the existing recreational facilities inadequate for the long term success of the community. Mr. Manuel convinced the CDD Board to form an independent Ad Hoc Recreation Committee, of which he was a member. He negotiated with the developers of Aberdeen/ Durbin to acquire land outside the CDD for the new recreational facility. Mr. Manuel used his past experience to persuade the CDD Board of the wisdom in refinancing the existing CDD debt to take advantage of lower interest rates. The Board created a Series A bond (to refinance the old debt) and a Series B Bond (for the new recreational facility). This was all completed without any increase in the CDD annual fees paid by residents.

During 2002, the Florida Legislature passed a law that permitted local School Boards to appoint one member to the local Planning & Zoning Agency. The Legislature was concerned about the lack of planning coordination between counties, cities and school boards in addressing local growth management issues. The Legislature decided school boards were entitled to representation on local zoning boards to improve the planning coordination. Mr. Manuel applied to the St. Johns County School Board for the appointment to the St. Johns County Planning & Zoning Agency. He was appointed by the School Board by a vote of 5-0 in September 2002. In early October, 2002, the St. Johns County Board of County Commissioners (BOCC) attempted to challenge his appointment to the Planning & Zoning Agency by the School Board.

In late October, 2002, Mr. Manuel received a heart transplant.

In December, 2002, other Planning & Zoning Agency members voiced their frustration about the role of the Planning and Zoning Agency. Also, in December, 2002, the St. Johns County School Board reaffirmed Mr. Manuel's appointment to the PZA by a vote of 3-2. At the PZA, Mr. Manuel fought the growth management policies (or lack thereof) in the County. During the first two years

of his PZA tenure, he was consistently outvoted usually 6-1.

As he was the appointed representative of the school board, Mr. Manuel was an ardent defender of St. Johns County school system, believing that the quality of the school system was the major economic driver of the county. The school system is consistently ranked in the top 5 in the state (currently number one). Excessive or excessively-paced growth places too much pressure on a school system. The critical question was whether the area where a proposed development was to be located have sufficient school capacity. In most cases, the answer was no.

Another major issue was safety/transportation: Whether traffic concurrency was available to a proposed project and, if not, how was this important deficiency to be addressed? It was this issue starting in 2003 that caused his concern about I-95/ CR210 intersection, the so-called "PM fix."[1]

Another issue for Mr. Manuel was the timing of infrastructure improvements. He initiated the discussion that all horizontal infrastructure had to complete before any vertical structures could be built, as it takes a lot longer to build a road than it does to build a house. Such policy was adopted by the County and is in effect today.

Starting in early 2004, Mr. Manuel's continued repetition of these three issues heightened the level of concern at the PZA level. Growth management, or the lack thereof, was a major campaign issue during the 2004 County Commission election cycle. Unfortunately, the pro-growth forces and their candidates maintained control of the BOCC and only lost one seat. However, at the

---

[1] The term "PM fix" relates to the county acquisition of land at the intersection of Interstate 95 and County Road 210 to support infrastructure improvements necessary to alleviate traffic backups caused by the inadequacy of the intersection for afternoon ("p.m.") rush hour traffic. Mr. Manuel had publicly supported the project for years. *See* Exhibit 8, attached hereto.

PZA level the growth management concerns continued, and Mr. Manuel started to gain support, especially regarding projects in the North West section of the county where the growth was clearly unsustainable. From 2004 through 2006 the PZA recommended denial to the BOCC 32 out of 36 times for growth related projects. All but twice, the BOCC ignored the recommendation of the PZA and voted approval, normally on a 4-1 vote.[2]

Mr. Manuel realized the BOCC had no respect for PZA decisions and, therefore, there was little he could do to shift the discussion to a controlled growth approach rather than growth at any cost. Due to this realization, Mr. Manuel decided to run for the County Commission.

Mr. Manuel's campaign strategy against the incumbent was: First, voting record (as he was on the PZA at the same time the incumbent was on the BOCC, there existed an apples to apples comparison which became a huge campaign issue); second, money (where did the incumbent get his campaign funds and where did Mr. Manuel get his?) (Mr. Manuel put a limit of a maximum contribution of $200 (State Law is $500) and it had to be from a SJC resident or business – he raised $8,000 and the incumbent raised $147,000) and third, questioning who each candidate represents? In an upset victory Mr. Manuel won by around 600 votes despite his opponent running a very nasty campaign. Another reform candidate also won (by 58 votes). This resulted in a new reform majority on the BOCC.

The new commission moved swiftly to implement changes.

---

[2] Mr. Manuel did not believe that intersection could handle the proposed traffic resulting from the booming development taking place along CR210. The Planning & Zoning Agency acts as a recommending body to the BOCC. The BOCC is not bound by the recommendations of the PZA; however, traditionally the BOCC had generally adopted the recommendation of the PZA. With the exception of the School Board appointee, the PZA members are selected by the BOCC and serve at the pleasure of the BOCC. Historically, the questioning Agency members were removed from the PZA by the BOCC).

**A.    On the County Level:**

- The commission elected a new Chairman.

- Mr. Manuel was elected Vice Chairman.

- The County Administrator retired.

- The commission selected an Interim County Administrator.

- On Mr. Manuel's motion, the commission retained an executive search firm to find a new County Administrator. His goal was to remove politics from the selection of a new County Administrator. *See* Exhibit 9, attached hereto.

- The commission passed a Neighborhood Bill of Rights that gave communities the same information/ presentation/ time status as an applicant. *See* Exhibit 10, attached hereto.

- On Mr. Manuel's motion, the commission implemented a hiring freeze (he was very concerned about what was happening in the economy and wanted the county to be ahead of the coming budgetary problems). *See* Exhibit 11, attached hereto.

- After a thorough Budget Review/ Overhaul in 2007, the Commission passed the largest tax cut in the County's history.

- Reduced the size of government by over 100 employees while the County population increased 7,000+.

- Accomplished these tasks without any diminution of the level of service the County provided.

- Mr. Manuel was named Chairman of the BOCC by a vote of 5-0 in November 2007.

- He initiated the discussion on Consolidation - difference between "branding" and "operations" to save tax payer money.

- He moved for a straw vote to abolish the Mosquito Control District (a separate taxing authority). This motion failed by a BOCC vote of 3-2

- He moved for a straw vote to abolish the St Augustine Airport Authority (a separate taxing authority). This motion also failed by a BOCC vote of 3-2.

- He commenced the revamping of the County's tourism efforts after being named Chairman of the Tourist Development Council (TDC). The TDC, under his leadership, initiated the Destination St. Johns County Master Tourism Development Plan.

- He supported and helped to create a County Local Arts Agency.

- He learned that many County contracts had not been rebid in a very long time (one over 20 years). He felt this was a form of institutional corruption. The County purchases approximately $30 million of services from outside vendors. He started the rebidding of all County contracts resulting in a savings of approximately $4 million without any diminution in service levels. On a $110 million General Fund budget, this is a very sizable savings. The 2008 County Budget was balanced due to his efforts. *See also,* Exhibit 12, 13 and 14, attached hereto.

**B.** **On the Regional Level**

- Mr. Manuel understood that for St. Johns County to be successful especially in its economic development strategies to improve its commercial tax base and reduce its dependency on residential tax base, officials had to be more active in guiding the important common regional issues; specifically, transportation, economic development and the environment. He sought to put himself in a position to guide those discussions. *See* Exhibit 15, attached hereto.

- He was appointed as the St. Johns County representative to the North East Regional Planning Council (NERPC). In his second year on the Board, he was named Vice Chairman of the Growth Management committee.

- On his recommendation, the NERPC held a workshop on the St Johns River to develop a seven county position paper.

- He convinced the NERPC to recommend denial of a Development of Regional Impact (Mariposa in Putnam County) to the Florida Department of Community Affairs (DCA) on the basis of urban sprawl. DCA upheld the recommendation.

- He was appointed as the St. Johns County representative to the Metropolitan Planning Organization (MPO). In his second year he was named Treasurer of the MPO putting him in place to be named Chairman in two years (he would have been the first Chairman from SJC). He initiated the "rebranding" of the MPO to its new name North East Transportation Planning Organization .

- He initiated and was a member of the Outer Beltway Sub-Committee of the TPO.

15

- He was recognized as a regional leader by the *Florida Times Union* newspaper and Florida Trend magazine. *See also,* Exhibits 16 and 17, attached hereto.

These are the circumstances under which the offense conduct in this case transpired. Also in this context, Mr. Manuel consulted at length with Bruce Robbins, regarding the potential sale of a portion of Imeson Park in Duval County to Jaxport, the port authority in Jacksonville, as a transportation corridor from the port to Interstate 95. Mr. Manuel rationalized his acceptance of funds in this case as being justifiable based on his perception at the time that his lobbying efforts regarding the sale of Imeson Park, outside of St. Johns County, was independent of his position as a St. Johns County Commissioner. His mind set was bolstered by his Imeson Park efforts, including that earlier on the day of his receipt of the first payment on April 10, 2008, he had met regarding the Imeson Park issue, among others, with Ricardo Morales, Jr., a member of the Jaxport Board of Directors.[3] He was further impacted by his consumption of alcohol during his dinner with Mr. Robbins that day, uncharacteristic because of the potential adverse interactions of alcohol with his medications.

On June 5, 2008, Mr. Manuel was detained by FBI Special Agents Doug Matthews and Eileen Jacob after receiving the second payment involved in this case. He was taken by the agents to the FBI office in Jacksonville, where he was given the option to cooperate or not. He immediately accepted responsibility and agreed to cooperate, and the following day began recording conversations with others at the direction of the agents. On June 11, 2008, he received a call from

---

[3] In fact, Mr. Manuel continued to work on the Imeson Park project with the First Coast Metropolitan Planning Organization even well after being confronted by the FBI and admitting his wrongdoing to the agents. *See* Exhibit 18, attached hereto.

St. Johns County Sheriff David Shoar, saying he knew everything about Mr. Manuel's case and suggesting that he resign from the county commission.

On June 12, 2008, Sheriff Shoar publicly disclosed the investigation to the news media. The deliberate disclosure, which contravened Department of Justice and FBI policy, foreclosed Mr. Manuel's ability to provide cooperation that could rise to the level of constituting substantial assistance under the standards of the United States Attorney's Office, although he continued his efforts for another six days. He should not in effect be penalized for the unauthorized disclosure of the investigation, which negated his ability to cooperate.

Mr. Manuel's wife owns a home, subject to a substantial mortgage on which both he and his wife are obligated, with payments of $1,154.00 per month, as well as $325.00 per month in property taxes and $75.00 per month in insurance payments. Mr. Manuel's Social Security Disability Income is essential to the family's ability to pay the mortgage, taxes and insurance on the home. His wife's income is insufficient to do so and otherwise support herself and their young daughter. Given current market conditions, the home cannot be sold.[4] If Mr. Manuel is incarcerated, his SSDI income stops, and the home would go into foreclosure.

The facts and circumstances of this case and the nature and characteristics of the Defendant, including his physical and mental health issues, compel a sentence without incarceration. Mr. Manuel's stress over his serious medical and financial straits affecting himself, his wife and his young child, coupled with his poor judgment, flighty thought and risky judgment arising from his then-undiagnosed bipolar disorder, resulted in him latching onto a financial opportunity that he rationalized to be legitimate because of his involvement in the Imeson Park discussions with Mr.

---

[4] A residence he owns in Welaka already is in foreclosure.

Robbins, Mr. Morales and others. His health and family needs mitigate heavily in favor of a non-incarcerative sentence. A sentence of probation, home confinement, or a combination thereof, is reasonable and is sufficient, but not greater than necessary, to serve the statutory purposes of sentencing. Accordingly, the Court should impose a sentence without incarceration.

                                      Respectfully submitted,

                                      */s/    D. Gray Thomas*
                                      Wm. J. Sheppard, Esquire
                                      Florida Bar No.: 109154
                                      D. Gray Thomas, Esquire
                                      Florida Bar No.: 956041
                                      Matthew R. Kachergus, Esquire
                                      Florida Bar No.: 503282
                                      Sheppard, White, Thomas & Kachergus, P.A.
                                      215 Washington Street
                                      Jacksonville, Florida 32202
                                      Telephone:    (904) 356-9661
                                      Facsimile:    (904) 356-9667
                                      Email:        sheplaw@att.net
                                      COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

     I HEREBY CERTIFY that on January 8, 2010, I electronically filed the foregoing with the Clerk of the Court by using CM/ECF System which will send a notice of electronic filing to the following:

                      **Julie Hackenberry Savell, Esquire**
                      **Assistant United States Attorney**
                      **300 North Hogan Street**
                      **Suite 700**
                      **Jacksonville, Florida 32202**

I HEREBY CERTIFY that on January 8, 2010, a true and correct copy of the foregoing document and the notice of electronic filing was sent by United States Mail to the following non-CM/ECF participants:

N/A

/s/   D. Gray Thomas
ATTORNEY

ldh[manuel.sentencing.memo]